**FILED**

JAN 2 8 2008

ANGELA DAVIS,

      **Plaintiff,**

v.

                              **Civil Action No. 2:06CV94**
                              **(The Honorable Robert E. Maxwell)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying the

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Angela Davis ("Plaintiff") filed an application for DIB on February 24, 2004, alleging

disability since December 2, 2002, due to fibromyalgia and herniated disks (R. 52, 66). Plaintiff's

application was denied at the initial and reconsideration levels (R. 29-35, 36-41). On November 4,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

2004, Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ") held on October 12, 2005 (R. 312-46). Plaintiff, who was assisted at the hearing by, Andrea Pecora, an independent Social Security disability representative, testified on her own behalf (R. 314-31). Also testifying was Vocational Expert Larry Bell ("VE") (R. 331-36). On January 5, 2006, the ALJ entered a decision finding Plaintiff was not disabled because she could perform light work and her past work (R.20). Plaintiff timely filed a request for review, which the Appeals Council denied on July 28, 2006, making the ALJ's decision the final decision of the Commissioner (R. 5-11).

## II. STATEMENT OF FACTS

Plaintiff was born on October 3, 1963, and was forty-two years old at the time of the ALJ's decision (R. 21, 50). Plaintiff was a college graduate, and her past work included that of accountant and financial analyst (R. 67, 72).

On February 26, 2002, a x-ray was made of Plaintiff's right shoulder. The impression was for no significant abnormality (R. 130).

On February 27, 2002, Plaintiff presented to Doctors' Quick Care with complaints of sharp pain in her shoulder and neck, which she described as "8 on scale of 1-10." Plaintiff reported her pain was exacerbated by movement and relieved by Advil (R. 135). Plaintiff had full range of motion, but pain of her right shoulder upon examination (R. 136). Vioxx, Zanaflex and Darvocet were prescribed to Plaintiff (R. 137).

On February 27, 2002, a x-ray was made of Plaintiff's cervical spine, which showed "some minimal anterior osteophytosis at the inferior aspect of C the superior aspect of C5." The impression was for "somewhat limited study with mild degenerative change" (R. 134).

On December 6, 2002, Plaintiff presented to Doctors' Quick Care with complaints of back

2

pain with radiation to her right shoulder and arm (R. 131). Plaintiff was prescribed Valium (R. 133).

On the 26th day of December, 2002, a x-ray was made of Plaintiff's thoracic spine. Plaintiff's alignment was normal; she had minimal spurring; and the height of the vertebral bodies and the disc spaces were well maintained (R. 138).

Plaintiff's December 26, 2002, right shoulder x-ray was normal (R. 130).

On January 2, 2003, Plaintiff presented to Louis Ortenzio, M.D., with right shoulder pain "status post motor vehicle accident." Plaintiff also reported a stiff neck. Dr. Ortenzio found Plaintiff had good range of motion in her neck, regular pulses, and normal HEENT. Dr. Ortenzio prescribed Lorcet (R. 206).

On January 15, 2003, Plaintiff underwent a MRI of her cervical spine. It showed central disc herniation at C5-6 and a right paracentral disc herniation at C6-7, with areas of spinal stenosis (R. 209).

Also on January 15, 2003, Plaintiff underwent a MRI of her right shoulder. The impression was unremarkable (R. 210).

On January 24, 2003, Plaintiff reported to Dr. Ortenzio that she experienced numbness in her right hand and arm (R. 204). He found Plaintiff had full range of motion of her right arm and shoulder and, except for numbness in the right arm and hand, her systems were normal. He diagnosed herniated disc at C5-6 and C6-7 and stenosis in cervical area. Dr. Ortenzio prescribed Lorcet and Flexeril (R. 205). Plaintiff was admitted to United Hospital Center on February 27, 2003, for cervical spine pain (R. 114, 117). Plaintiff was treated with Percocet (R. 119). She was discharged on March 4, 2003 (R. 114). She was medicated with Lorcet, OxyContin, Haldol, Neurontin, Paxil, Bextra, and Skelaxin upon release (R. 115).

3

On March 4, 2003, Plaintiff received a cervical epidural steroid injection (R. 148).

On March 25, 2003, Dr. Justo provided Plaintiff a cervical epidural steroid injection for treatment of brachial neuritis/radiculitis. Plaintiff tolerated the procedure well (R. 140-41, 147).

On April 14, 2003, Plaintiff reported the second spinal injection helped her condition thirty percent, but she had improved eighty percent since the March 25 injection (R. 142).

On June 2, 2003, Plaintiff was evaluated by Julian Bailes, M.D., and Rolando Garcia, PA-C, upon referral by Dr. Ortenzio. Plaintiff reported tingling sensation and pain of the right side of her neck and her right shoulder, but that her "symptoms [were] not as bad as they were considering that the epidural shots and her meds. have been helping alleviate her symptoms." Plaintiff reported medicating with Topamax, Neurontin, OxyContin, and Lorcet "on an as needed basis for her pain symptoms" (R. 150).

Dr. Bailes and Physician Assistant Garcia's examination revealed Plaintiff was in no distress; was afebrile; had a steady gait; had intact motor functions; had good full range of motion; had no muscle spasms; had intact sensory functions; had negative straight-leg raising test, bilaterally; had no Spurling's; had intact recent and remote memories; had normal attention span and concentration; and had intact cranial nerves. Plaintiff's cervical MRI report (not the films) was reviewed, and a C5-6 central disk herniation and right paracentral C6-7 disk bulge with mild spinal stenosis were noted. Surgery was discussed with Plaintiff and she was instructed to "think about her options (R. 151).

On July 28, 2003, Plaintiff presented to Dr. Ortenzio with complaints of neck pain and stiffness and right arm pain, but no weakness. She was medicating with Oxycontin (R. 200). Dr. Ortenzio diagnosed cervical strain (R. 201).

On August 25, 2003, Plaintiff presented to Dr. Ortenzio's practice with neck and shoulder

pain (R. 198). Her systems were normal and she was diagnosed with chronic pain syndrome, lumbar strain, fibromyalgia, and cervical disc herniation and prescribed OxyContin and Lorcet (R. 199).

On September 22, 2003, Plaintiff reported to Dr. Ortenzio that she needed refills on her medications. He found she had hip pain (R. 196). Except for tenderness at the left hip, Plaintiff's systems were normal. Dr. Ortenzio diagnosed cervical pain due to herniated disc and hip pain. He continued Plaintiff's prescription for OxyContin and provided her with "injections" (R. 197).

On October 13, 2003, Plaintiff reported she had done increased housework, which resulted in her being stiff and sore (R. 193). Plaintiff's systems were normal. Dr. Ortenzio prescribed OxyContin and Lorcet (R. 194). His diagnoses were spinal disc disease, herniated disc, and persistent pain (R. 195).

On November 10, 2003, Plaintiff presented to Dr. Ortenzio with neck and shoulder pain. She reported she needed her medications refilled; she had gone to Mexico and had contracted diarrhea; she experienced pain on a scale of seven at the most and at four at a minimum; she had experienced hearing loss; and she received injections at the pain clinic, which had "helped" (R. 191). Plaintiff's systems were normal. Dr. Ortenzio diagnosed traveler's diarrhea, reduced hearing, and pain caused by herniated disc. He prescribed OxyContin and referred Plaintiff to an E.N.T. for an audiology evaluation (R. 192).

On December 8, 2003, Plaintiff presented to Dr. Ortenzio for a follow-up examination for herniated cervical discs (R. 188). Dr. Ortenzio found Plaintiff's HEENT, neck, respiratory, cardiovascular, chest/breast, abdomen, lymphatic, skin, musculoskeletal, neurologic, and psychiatric examinations were normal and diagnosed cervical strain and persistent pain syndrome (R. 189-90).

On January 6, 2004, Plaintiff reported to Dr. Ortenzio that she was "thinking about surgery"

5

because she did not "like being on meds." Plaintiff stated her pain was controlled with OxyContin and Lorcet. Dr. Ortenzio found Plaintiff was congested with a sore throat and that all other systems were normal (R. 186). He diagnosed pain due to herniated disc and upper respiratory infection. Dr. Ortenzio prescribed OxyContin (R. 187).

On February 3, 2004, Dr. Ortenzio noted Plaintiff's mood was stable. Plaintiff reported she "would be better if she could sleep better." Plaintiff informed Dr. Ortenzio that she had an appointment with Dr. Bailes and that she wanted surgery. Plaintiff stated her shoulder and neck pain were a six on a scale of one-to-ten (R. 184). Dr. Ortenzio found Plaintiff was well developed, looked well, and was well nourished. He found her respiratory, cardiovascular, musculoskeletal, neurologic, and psychiatric systems were normal. Dr. Ortenzio diagnosed upper back pain, depression, and insomnia. He prescribed OxyContin, Paxil, and Benadryl (OTC) for a sleep aide (R. 185).

On February 26, 2004, Dr. Ortenzio noted Plaintiff was "doing ok." She reported she was still having pain in her neck and shoulder, but that the OxyContin "help[ed]" (R. 182). Dr. Ortenzio's examinations of Plaintiff's neck, respiratory, cardiovascular, musculoskeletal, and psychiatric systems were normal. He found Plaintiff had right neck spasms. He diagnosed neck pain due to herniated disc and depression and prescribed OxyContin, Lorcet, and Paxil (R. 183).

On March 25, 2004, Plaintiff reported to Dr. Ortenzio that she was "doing ok w/ meds" and that her best days were when she had pain at four on a scale of one-to-ten. She reported she had been examined by Dr. Bailes and that she was candidate for surgery, which would occur "probably [in] summer." Plaintiff also reported she was "leaving for a cruise" (R. 180). Dr. Ortenzio noted Plaintiff respiratory and psychiatric systems were normal; diagnosed neck and back pain and a herniated disc; and prescribed OxyContin (R. 181).

On April 21, 2004, a Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff for neck pain, degenerative disk disease, spinal stenosis of the cervical spine, herniated disc and fibromyalgia (R. 152). Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 153). Dr. Franyutti found Plaintiff was occasionally limited in her ability to climb, balance, stoop, kneel, crouch, or crawl (R. 154). Plaintiff was found to have no manipulative, visual, or communication limitations (R. 155-56). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, extreme heat and hazards, but that her exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gasses, and poor ventilation was unlimited (R. 156). Dr. Franyutti reduced Plaintiff's RFC to light due to back and arm pain syndrome, hip pain, fibromyalgia pain, and fatigue (R. 157).

On April 22, 2004, Plaintiff reported to Dr. Ortenzio that her back did well when she carried items; she had good days and bad days; her good days were pain at five on a scale of one-to-ten; her bad days were pain at eight on a scale of one-to-ten; and she was decreasing her intake of Lorcet (R. 178). Dr. Ortenzio found Plaintiff's respiratory, cardiovascular, musculoskeletal, and psychiatric examination results were normal. He noted Plaintiff had "spasm" during the musculoskeletal examination. Plaintiff "look[ed] well" and was well developed and well nourished. Dr. Ortenzio diagnosed back pain with spasm and prescribed OxyContin and Lorcet (R. 179).

On April 23, 2004, James Capage, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found she had an affective disorder, specifically, depression, an impairment that was not severe (R. 160, 163). Dr. Capage found Plaintiff had no restrictions of activities of daily living;

no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (R. 170).

On May 20, 2004, Plaintiff presented to Dr. Ortenzio with complaints of shoulder and neck pain. She was seeking "disability for fibromyalgia." Dr. Ortenzio noted his review of her systems – except neck and back – was negative (R. 176). Dr. Ortenzio's examination revealed reduced tone in Plaintiff's right shoulder; neck pain, and increased right shoulder pain. He assessed myospasm and persistent pain syndrome (R. 177).

On June 21, 2004, Plaintiff was examined by Dr. Ortenzio for fibromyalgia and herniated disc. Plaintiff informed Dr. Ortenzio that she was "very concerned about being alone" and she had "empty nest syndrome issue[s]." Plaintiff stated she experienced neurologic numbness, neck pain, hip pain, shoulder pain, sleeplessness, and constipation (R. 174). Dr. Ortenzio noted reduced range of motion in Plaintiff's neck, diagnosed chronic cervical pain and prescribed OxyContin (R. 175).

On July 28, 2004, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He noted her primary diagnosis was for herniated disc and her secondary diagnosis was for fibromyalgia (R. 211). Dr. Lauderman found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 212). Dr. Lauderman found Plaintiff was occasionally limited in her ability to climb, balance, stoop, kneel, crouch, and crawl (R. 213). Plaintiff had no manipulative, visual, or communication limitations (R. 214-15). Dr. Lauderman found Plaintiff should avoid concentrated exposure to extreme cold and heat and hazards and was unlimited in her exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor

ventilation (R. 215). Dr. Lauderman reduced Plaintiff's RFC due to pain and fatigue, reduced ADL's, and reduced range of motion. He noted Plaintiff was credible (R. 216).

On November 1, 2004, Plaintiff became a patient of Thomas J. Romano, M.D., Ph.D., FACP, FACR (R. 250-52). Plaintiff reported she was referred to Dr. Romano by Andrea Pecora, an independent Social Security disability representative. Plaintiff listed her drugs as OxyContin, Lorcet, Celebrex, Nexium, and Benicor. Plaintiff listed her family physician as Dr. Ortenzio (R. 253). Plaintiff reported burning and stabbing pain in her chest, aching pain in her stomach and groin, burning pain in her right leg joint, stabbing pain in her left leg joint, aching pain in her left thigh, aching pain in her neck, stabbing pain in her right shoulder, feelings of pins and needles in her right arm and hand, and burning pain in her left buttock (R. 254). Plaintiff stated her pain began in her left hip six or seven years previously and had spread (R. 244).

Plaintiff informed Dr. Romano that she clinched her mouth and grinded her teeth at night while she slept, experienced frequent jaw pain, her fingers turned purple and pale when exposed to cold, had abdominal discomfort when nervous, had diarrhea or constipation often, and had frequent headaches with neck pain and stiffness (R. 255).

Plaintiff completed an Activities and Lifestyle Index. She reported she had no difficulty lifting a full cup to her mouth or turning on or off water faucets. Plaintiff stated she had some difficulty dressing herself, getting in and out of bed, walking outdoors on flat ground, bathing, bending to pick up objects from the floor, and getting in and out of a car. Plaintiff stated she felt worse on the date of this examination than she did one month ago and that she had many limitations. Plaintiff reported she was very dissatisfied with her ability to do her usual activities, she felt stiff in the morning, and it took one hour for her to feel limber after rising (R. 256). Plaintiff stated her pain

was present all the time and was increased after exercise and sitting. Her pain was relieved by lying down, pain medications, and cortisone injections (R. 258). Plaintiff reported frequent difficulty sleeping and feeling as tired when she awoke "as when [she] went to bed" (R. 259). Plaintiff stated she "jerk[ed]" during her sleep, which often awoke her (R. 255). Plaintiff stated she walked for exercise, but not often (R. 260). Plaintiff noted she felt sad and anxious (R. 261). Plaintiff reported she had blurred vision, had ringing in her ears, was hard of hearing, had trouble concentrating, was "tired out," was moody, was irritable, and was anxious (R. 262).

Plaintiff reported to Dr. Romano that she felt like a fifty-five year old woman. She stated a previous motor vehicle accident caused the herniated disc in her cervical spine (R. 265). Plaintiff's dolorimetry examination was abnormal (R. 244, 269). Plaintiff had pain, on palpation, to the bilateral occipital, low cervical, trapezius, supraspinatus, second rib, lateral epicondylar, medial knee fat pad, gluteous medius and greater femoral trochanteric bursal areas (R. 244). Dr. Romano found Plaintiff had spasm, myofascial bands and trigger points in her bilateral trapezius, bilateral levator scapulae, bilateral rhomboids, right quadratus lumborum, right iliocostalis, right multifidus, right bilateral gluetus minimus and bilateral gluetus medius area (R. 244-45). Dr. Romano found Plaintiff had reduced range of motion in her shoulders, especially her right shoulder, but a negative straight leg raising test (R. 245).

Dr. Romano prescribed OxyContin and Lorcet, "pending notification that no other doctor" was prescribing these medications (R. 270). He also prescribed Klonopin (R. 271).

On November 5, 2004, Dr. Romano prescribed Lorcet and OxyContin to Plaintiff (R. 248).

On November 17, 2004, Plaintiff informed Dr. Romano that she was sleeping better and that her pain was "under fairly good control." Dr. Romano prescribed OxyContin, Lorcet, Klonopin, and

10

DHEA. He instructed Plaintiff to "do not overdo" her activities (R. 246).

On December 14, 2004, Plaintiff reported to Dr. Romano that she was going on a cruise on January 2, 2005, and desired to get her prescriptions filled before she sailed. Plaintiff stated she was very stiff and her pain continued. Dr. Romano noted Plaintiff's range of motion was reduced. Dr. Romano instructed Plaintiff to perform shoulder range of motion exercises and he prescribed OxyContin, Klonopin, and Lorcet to Plaintiff (R. 241, 242).

On December 16, 2004, Plaintiff reported to Dr. Romano that she had "super 'burst of energy,'" kept "going & going," slept well, and her pain level was "fine" (R. 240).

On January 12, 2005, Plaintiff presented to Dr. Romano for follow-up care. She reported that during her cruise, she was "able to do more" and her "ADL's [were] easier." Dr. Romano prescribed Lorcet, OxyContin, DHEA, and Klonopin (R. 239).

On January 26, 2005, Plaintiff reported to Dr. Romano that the medications "help[ed] ADL's" and the "shots" had "helped a lot last time." Dr. Romano found Plaintiff had reduced ranges of motion in her shoulder and cervical spine, but she had no spasms. He prescribed OxyContin, Lorcet, Klonopin, and DHEA and advised Plaintiff to "not overdo" activities (R. 237, 238).

On February 28, 2005, Plaintiff informed Dr. Romano that her "meds help[ed] ADL's" (R. 236). Dr. Romano prescribed Lorcet and OxyContin to Plaintiff (R. 235).

On March 13, 2005, Sean Nolan, M.D., reported to Dr. Romano that Plaintiff had significant "physical stress surrounding a mentally unbalanced husband who subsequently committed suicide," which caused depression, fatigue, passive behavior, arthritis, and myalgia and that Plaintiff's symptoms became worse after she was involved in a motor vehicle accident in 2002. Dr. Nolan noted Plaintiff had been diagnosed with cervical stenosis, fibromyalgia, herniated discs with

11

secondary depression. Dr. Nolan opined Plaintiff's physical examination was unremarkable (R. 276). Dr. Nolan referred Plaintiff for an "arginine infusion growth hormone test" to determine Plaintiff's eligibility for growth hormone teatment (R. 277).

On March 15, 2005, Dr. Ortenzio found Plaintiff's psychological, HEENT, respiratory, cardiovascular, and gastrointestinal systems were normal. She had multiple trigger points, particularly in her shoulder and neck (R. 288).

On March 29, 2005, Plaintiff reported to Dr. Romano that her right shoulder and right neck area were stiff, but the pain medication helped relieve her symptoms. He prescribed Lorcet, OxyContin, and Klonopin (R. 233-34).

On April 25, 2005, Plaintiff returned to Dr. Romano with complaints pain and reported the medication "help[ed] . . . ADL's." Dr. Romano found Plaintiff had reduced range of motion in her shoulder and prescribed Lorcet, Fioricet, OxyContin, and Mag-Tab SR (R. 230-31, 232, 235).

On May 17, 2005, Dr. Romano prescribed DHEA to Plaintiff (R. 230).

On May 25, 2005, Plaintiff reported to Dr. Romano she had pain, but that medication "help[ed] ADL's," her headaches were much better, and the "shots helped." Dr. Romano noted Plaintiff's ranges of motion in her cervical spine and shoulder were reduced. He prescribed Lorcet and OxyContin (R. 228-29).

On May 31, 2005, Dr. Ortenzio examined Plaintiff and found her psychological, neurological, HEENT, and gastrointestinal systems were normal. He found Plaintiff experienced tingling during her musculoskeletal examination (R. 286).

On June 3, 2005, Dr. Nolan reported to Dr. Romano that Plaintiff was not a candidate for growth hormone treatments, a determination based on the growth-hormone test results from May 6, 2005 (R. 275, 280-82).

On June 24, 2005, Dr. Romano prescribed Klonopin, Lorcet, and OxyContin to Plaintiff (R. 226, 228-29).

On July 22, 2005, Plaintiff informed Dr. Romano that she'd been "overdoing it" as she had been "packing and unpacking." She reported her left hip was "worse." Dr. Romano told Plaintiff not to "overdo" her activities. (R. 227). He prescribed Lorcet (R. 226).

On August 15, 2005, Plaintiff's hearing was evaluated at Morgantown E.N.T. Clinic. Plaintiff was diagnosed with symmetric sensorineural hearing loss. The audiologist discussed the possibility of Plaintiff's using hearing aides; Plaintiff stated she would "talk with several different audiology groups about the cost and benefits of hearing aides and she will follow-up with audiology as needed for a hearing aid evaluation" (R. 222).

On August 22, 2005, Dr. Romano noted Plaintiff's ranges of motion of her shoulder and cervical spine were reduced (R. 225). He prescribed Lorcet, OxyContin, and Genotropin (R. 224).

On September 8, 2005, Plaintiff was examined by Dr. Ortenzio, who found Plaintiff had normal psychological, neurological, HEENT, respiratory, cardiovascular, abdominal, and intestinal examinations. Dr. Ortenzio opined Plaintiff had decreased range of motion in her neck and multiple trigger points (R. 283). Plaintiff stated she experienced "stress" related to her daughter and she was "still stuck to get over the . . . hump regarding the past." Plaintiff stated friends came "to see [her] to talk about her problems." Dr. Ortenzio opined Plaintiff needed to improve her insights and needed to "decide that she want[ed] to get on with her life and find herself" (R. 284).

Administrative Hearing

At the October 12, 2005, administrative hearing, Plaintiff testified she drove a car between forty and fifty miles per week and that she had driven to the hearing that day (R. 316-17). Plaintiff

stated some of her medications made her tired and nauseated (R. 320). Plaintiff described a typical day as her rising and taking her daughter to school (however, Plaintiff testified sometimes her parents got her daughter ready and took her to school, and Plaintiff then rose at 9:30 to 10:00 a.m.); sitting; walking; bathing; running a few errands; washing clothes if she felt like it; and collecting daughter from school at 3:00 p.m. Plaintiff testified she did not cook dinner, participate in community activities, partake in hobbies, or exercise (R. 321). Plaintiff stated exercise and physical therapy made her symptoms worse. She testified she could walk for one-half block, sit without standing for twenty minutes, and stand without sitting for ten minutes. Plaintiff stated she could carry "a bag or so" of groceries into her home, but she usually had her children carry them (R. 322). Plaintiff stated she occasionally visited with friends or family. Plaintiff testified she had taken a cruise with her daughter and had vacationed with her daughter, "to kind of relax in the sun or something but not to like do major activities." Plaintiff stated her pain was a six or seven on a scale of one-to-ten on a good day and was a ten on a bad day (R. 323). Plaintiff stated that she treats her symptoms with medication and lying down "for a little while" (R. 324). Plaintiff stated she received injections each month for fibromyalgia symptoms. Plaintiff stated she had not realized any relief from her growth hormone treatments as the treatments "takes at least six to twelve months to see any kind of difference" and she had only been taking the treatments for "a couple months" (R. 325). Plaintiff stated her neck pain caused her to be unable to straighten out her neck, caused headaches, and prohibited her from doing "a whole lot." Plaintiff testified her headaches were a daily occurrence (R. 326). Plaintiff stated she treated her "really, really bad headaches" with Fioricet or injections to her neck. Plaintiff testified she experienced pain in her shoulder with tingling and numbness into her arm and fingers (R. 327). Plaintiff stated her hearing loss was attributed to her

14

physiological age being that of a ninety-seven year old woman, according to Dr. Romano. Plaintiff stated she lost the "concept" of what is being said because of her hearing loss and she had to ask people to repeat what they had said to her (R. 328). Plaintiff testified she had difficulty concentrating due to her not feeling well or tiredness (R. 330). Plaintiff stated Dr. Romano had diagnosed depression due to her physical state and that if she could "get the physical pain under control" that she would not "need the emotional therapy" (R. 331).

The ALJ asked the VE the following hypothetical: ". . . imagine a hypothetical person of the claimant's age, background and work experience, who can do a range of light work with occasional posturals, a sit/stand option; would need to avoid extremes of temperature and cold or heat and cold, rather. Avoid hazards, some limitation on the use of her right shoulder and avoid loud noises. Would that person be able to do [Plaintiff's] prior work?" (R. 333). The VE responded that Plaintiff's prior work would not be precluded and that the work of office assistant and ticket seller, at the light level, and security monitor and general office clerk, at the sedentary level, would be available (R. 333-34). The ALJ asked if these jobs were precluded if such a person were limited in turning her head and rotating her neck. The ALJ replied that they would not be precluded. The ALJ asked if these jobs were precluded to a person who was off task twenty-five percent of the time; the VE answered in the affirmative (R. 334).

Appeals Council

On February 27, 2006, Dr. Romano completed a Medical Report of Plaintiff. He wrote he began treating Plaintiff on November 1, 2004, and continued his treatment of her on a monthly basis until January 30, 2006 (R. 291, 292). He noted Plaintiff's family doctor had diagnosed her with fibromyalgia six or seven years earlier and that a May, 2001, motor vehicle accident resulted in

herniated discs in her cervical spine. Dr. Romano recounted that Plaintiff had stated, on November 1, 2004, she had difficulty sleeping in that her body would jerk and she would awaken; she had to cease working in 2004 due to fatigue and the inability to sit for protracted periods of time; and she experienced depression, anxiety, shortness of breath, heartburn, nausea, constipation alternating with diarrhea, headaches, ringing in her ears, chest pain, and dry mouth. Plaintiff reported she had been prescribed OxyContin by a physician's assistant and that it helped her condition. Plaintiff stated she had gained twenty pounds in the past calendar year. Plaintiff reported she retired at 11:00 p.m., and slept, with interruption, until 6:30 a.m.; she assisted her daughter in getting off to school; returned to bed at 8:00 a.m. and slept until 10:00 a.m.; and felt like a fifty-five year old woman. Plaintiff stated, in November, 2004, her "best times [sic] of day is in the middle of the day." Plaintiff informed Dr. Romano that Amitriptyline made her tired; Prozac made her feel like a "zombie"; Paxil made her anxious and jittery. Plaintiff reported she was getting "worse and worse with chronic pain." Plaintiff stated she had difficulty dressing herself, getting in and out of bed, walking outdoors on flat ground, bathing, bending, and getting in and out of a car (R. 291).

Dr. Romano noted that his November 1, 2004, examination of Plaintiff revealed she had pain on palpation of the temporal mandibular joints bilaterally; decreased range of motion of the cervical spine in all directions; pain on palpation of the bilateral occipital, low cervical, trapezius, supraspinatus, second rib, lateral epicondylar, medial knee, gluteus medius, and greater femoral trochanteric bursal area, which were eighteen positive tender points. Dr. Romano found Plaintiff had decreased range of motion of the right shoulder. Plaintiff's straight leg raising test was negative. Dr. Romano noted Plaintiff was deconditioned but had no rheumatoid nodules, joint effusions, or bony ankylosis (R. 292).

Dr. Romano diagnosed Plaintiff with fibromyalgia, myofascial pain syndrome, probable temporal mandibular joint dysfunction, chronic right bicipital tendinitis with probably adhesive capsulitis of the right shoulder on November 1, 2004. Dr. Romano prescribed OxyContin, Lorcet, and Klonopin. Dr. Romano opined that, because of Plaintiff's "severe medical problems . . . she should be considered 100% permanently and totally disabled" (R. 292).

On May 11, 2006, Dr. Ortenzio wrote Plaintiff had suffered a great deal of psychologic trauma, depression, and psycho-physiologic myofascial pain syndrome for the past eight to nine years. He reported Plaintiff had undergone extensive traditional, alternative, and physical medical treatments, very sophisticated hormonal adjustments and had been treated by numerous psychotherapists, psychologists, and psychiatrist, but remained in "major depression with unremitting myofascial pain" from fibromyalgia. Dr. Ortenzio opined Plaintiff could not perform "even . . . short stints at even sedentary work" due to her depressive ruminations and poor concentration skills. Dr. Ortenzio wrote Plaintiff was, in his opinion, permanently and totally disabled (R. 311).

Appeals Council's Finding

In its July 28, 2006, denial of Plaintiff's request for review, the Appeals Council wrote it had "found no reason under [its] rules to review the Administrative Law Judge's decision." It opined it had reviewed Plaintiff's case and the additional evidence, specifically, the February 27, 2006, medical report from Dr. Romano and the May 11, 2006, letter from Dr. Ortenzio, but it did "not provide a basis for changing the Administrative Law Judge's decision" (R. 5-6, 8).

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

17

regulations at 20 C.F.R. § 404.1520 (2000), ALJ Cannon made the following findings:

1. The claimant has not engaged in substantial gainful activity since her alleged disability onset date.

2. The claimant has impairments considered severe based on the requirements in Regulations 20 CFR 404.1520(b)).

3. These medically determinable impairments do not meet or medically equal the severity of one of any listed impairment in Appendix 1, Subpart P., Regulation No. 4.

4. The claimant's assertions regarding her limitations are only partially [] for the reasons set forth above in the body of this decision.

5. I have considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR 404.1527).

6. The claimant has the following residual functional capacity: the claimant can perform light work which allowed a sit/stand option; she has limited range of motion in her neck and right shoulder; she should only occasionally climb, balance, stoop, kneel, crouch or crawl; she should avoid extremes of heat and cold; she should not be exposed to workplace hazards such as moving machinery or heights; she should not be exposed to loud noises.

7. The claimant [] classified as a younger individual (20 CFR 404.1563).

8. The claimant has a college education (20 CFR 404.1564).

9. The claimant can perform her past work as an accountant and financial analyst (20 CFR 404.1568) (R. 20).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo

review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The Appeals Council's failure to address new and material evidence and explain its refusal to review the ALJ's decision in light of that evidence constitutes reversible error.

2. The ALJ made an improper credibility assessment when she determined the Plaintiff was only partially credible on the issues of pain and physical limitations:

    A. The ALJ erred when she did not follow the proper two-step analysis when determining the credibility of the Plaintiff's subjective complaints regarding pain.

    B. The ALJ erred when she determined that the Plaintiff's subjective complaints of pain were not entirely credible due to the severity of her complaints.

19

The Commissioner contends:

1. Substantial evidence of record supports the credibility finding and the resulting RFC assessment commensurate with Plaintiff's past relevant work experience and other work in the national economy

2. The ALJ's pain analysis is adequately articulated and amenable to judicial review and Plaintiff's allegations of error are without merit.

3. The Appeals council properly denied review because Plaintiff failed to satisfy the requirements for new and material evidence.

## C. Appeals Council

Plaintiff argued that the Appeals Council's failure to explain why it decided that the February 27, 2006, medical report of Dr. Romano and the May 11, 2006, letter from Dr. Ortenzio did not provide a basis for changing the decision of the ALJ is error [Plaintiff's brief at p. 11]. Defendant argued that the Appeals Council "stated that it considered the reports from Drs. Romano and Ostentio [sic], but did not find a basis for changing the ALJ's decision under the laws, rules and regulations in effect"; that Plaintiff "provided no contrary statement to the Appeals Council to support Appeals Council review"; and that Plaintiff "is not without a remedy, because she may file a new application at any time" [Defendant's brief at p. 18].

The ALJ entered his decision finding Plaintiff was not disabled on January 5, 2006 (R. 12, 21). On February 27, 2006, Dr. Romano completed a medical report (R. 291-310). On April 14, 2006, the Appeals Council informed Plaintiff she had an additional twenty-five days in which to submit new and material evidence (R. 9-10). On May 11, 2006, Dr. Ortenzio completed a letter relative to Plaintiff's condition and ability to function (R. 311). On July 28, 2006, the Appeals Council acknowledged receipt of the additional evidence and informed Plaintiff that it had denied her request for review and that the additional information provided by her did not establish a basis

for changing the Administrative Law Judge's decision (R. 5-6, 8).

Plaintiff argued that the "failure" by the Appeals Council "to explain the weight afforded to evidence that directly contradicts the findings of the ALJ is error and requires remand for a proper evaluation of the evidence," citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980) (citing *Stawls v. Califano*, 596 F.2d 1209, 1218 (4th Cir. 1979)), and "if the Appeals Council ostensibly considers the new . . . evidence in denying review of a claim, it is incumbent on the Appeals Council to give some reason for finding that the . . . evidence does not justify further administrative action," citing *Alexander v. Apfel*. 14 F.Supp 2d 839, 843 (W.D.Va.1998) [Plaintiff's brief at pp. 8-9].

The undersigned recognizes this issue has generated conflicting opinions in the district courts of the Fourth Circuit. First, the regulations do not require the Appeals Council to state its rationale for denying review. See 20 C.F.R. § 404.970(b). Second, *Alexander* is of questionable precedential value, as it is a decision from another district, the Western District of Virginia. Third, in an unpublished opinion decided after *Myers* and *Alexander*, the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information. See *Hollar v. Commissioner of Social Security*, 194 F.3d 1304 (4th Cir. 1999)(unpublished), cert. denied, 120 S. Ct. 2228 (2000) (citing *Browning v. Sullivan*, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)). cf., *Harmon v. Apfel*, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow *Hollar* and instead required the Appeals Council to articulate its reasoning in declining review where new evidence was submitted). Finally, a subsequent decision in the Western District of Virginia concluded the exact opposite of the magistrate judge's decision in *Alexander*. In *Ridings v. Apfel*, 76 F. Supp. 2d 707 (W.D.Va. 1999), which was decided after *Alexander*, District Judge Jones held that the Appeals Council was not required to state its reasons for finding that the new evidence did

not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence, citing *Hollar*.[2]

Despite holding that the Appeals Council was not required to articulate its reasoning for denying review, Judge Jones, in *Ridings,* affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, <u>when reviewed along with [the new evidence]</u>." *Id*. at 709 (emphasis added). In other words, the Court must consider the new evidence together with the evidence before the ALJ to determine whether the ALJ's decision was supported by substantial evidence. See *Wilkins v. Secretary*, 953 F.2 <u>Id.</u> d 93 (4th Cir. 1991), which mandates:

> Because the Appeals Council denied review, the decision of the ALJ became the final decision of the Secretary. "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." The Appeals Council specifically incorporated [the new evidence] into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether evidence supports the Secretary's findings.

The undersigned must, therefore, review the record as a whole, including the medical report of Dr. Romano and Dr. Ortenzio's letter, to determine if substantial evidence supports the ALJ's decision

Dr. Romano's February 27, 2006, medical report revealed he began treating Plaintiff on November 1, 2004, and continued his treatment of her on a monthly basis until January 30, 2006 (R. 291, 292). In the medical report, he noted Plaintiff had been previously diagnosed with fibromyalgia and herniated discs in her cervical spine. Dr. Romano noted Plaintiff's November 1, 2004,

---

[2]Judge Jones did cite *Alexander* in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." <u>Id.</u> at n.6.

22

statements were she had difficulty sleeping in that her body would jerk and she would awaken; she had to cease working in 2004 due to fatigue and the inability to sit for protracted periods of time; and she experienced depression, anxiety, shortness of breath, heartburn, nausea, constipation alternating with diarrhea, headaches, ringing in her ears, chest pain, and dry mouth. She had been prescribed OxyContin by a physician's assistant and it helped her condition. She had gained twenty pounds in the past calendar year. She retired at 11:00 p.m., and slept, with interruption, until 6:30 a.m.; she assisted her daughter in getting readying for school; she returned to bed at 8:00 a.m. and slept until 10:00 a.m.; and she felt like a fifty-five year old woman. She had difficulty dressing herself, getting in and out of bed and/or a car, walking outdoors on flat ground, bathing, and bending (R. 291).

Dr. Romano wrote that, on November 1, 2004, Plaintiff had pain on palpation in all eighteen fibromyalgia tender points, had reduced range of motion in her right shoulder, had a negative straight leg raising test, but had no rheumatoid nodules, joint effusions, or bony ankylosis (R. 292).

Dr. Romano noted he had diagnosed Plaintiff with fibromyalgia, myofascial pain syndrome, probable temporal mandibular joint dysfunction, and chronic right bicipital tendinitis with probable adhesive capsulitis of the right shoulder on November 1, 2004, and had prescribed OxyContin, Lorcet, and Klonopin to Plaintiff. Dr. Romano then opined that, because of Plaintiff's "severe medical problems . . . she should be considered 100% permanently and totally disabled" (R. 292).

Reviewing Dr. Romano's report in conjunction with all the other evidence of record, especially Dr. Romano's office notes relative to his care and treatment of Plaintiff, the undersigned finds the February 27, 2006, medical report of Dr. Romano is not new and material evidence and would not have changed the ALJ's decision.

In *Wilkins*, supra, the Fourth Circuit determined that the Appeals Council *will consider*

23

evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins* further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.

Id. at 96.

Dr. Romano's February 27, 2006, medical report is almost an exact duplicate of his November 1, 2004, office note relative to Plaintiff's statements of pain and limitations, his findings, his method of treatment, and his diagnoses (R. 244-45, 291-93). In the February 27, 2006, medical report, Dr. Romano did add that Plaintiff was being treated with Genotropin. Except for this information, the February 27, 2006, medical report is duplicative and cumulative of a medical record already before and considered by the Commissioner. As such, it is neither new nor material, and it would not have changed the outcome of this matter.

In addition to recounting his November 1, 2004, findings, reiterating Plaintiff's complaints of pain and reports of activities and limitations, and repeating his diagnoses and methods of treatment of Plaintiff, Dr. Romano explained the types of the objective medical testing of Plaintiff in his February 27, 2006 medical report. He wrote Plaintiff fulfilled the American College of Rheumatology for fibromyalgia; tissue compliance testing is exclusively objective and her results were abnormal; the DHEA deficiency is exclusively an objective reading; and IGF-1 level testing is exclusively objective and her November 1, 2004, reading was 109 ng/M1, which was that of an eighty-seven year old woman (R. 293). Dr. Romano also attached literature about fibromyalgia to the February 27, 2006, medical report (R. 294-310). These details elaborate on the information that

was already before the Commissioner, and are informative, but would not change the ALJ's decision.

Additionally, Dr. Romano opined Plaintiff is one-hundred percent disabled. He did not express this opinion in the November 1, 2004, office note or any subsequent office note contained in the record of evidence. This opinion, however, is an opinion reserved to the Commissioner. 20 C.F.R. 404.1527(e) holds, in part, the following:

> (e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

Finally, as noted in the analysis below, the ALJ's decision is supported by substantial evidence, even when Dr. Romano's February 27, 2006, medical report, is evaluated in conjunction with all other evidence of record

Dr. Ortenzio treated Plaintiff from January 2, 2003, to September 8, 2005. He treated her for diagnoses of cervical strain; chronic pain syndrome, lumbar strain, fibromyalgia, and cervical disc herniation; left hip tenderness; spinal disc disease and persistent pain; upper back pain, depression and insomnia; and back pain with spasm. He prescribed Lorcet, Flexeril, OxyContin, Skelaxin, Paxil, and Benadryl. During his treatment of Plaintiff, she reported she had right shoulder pain, numbness in her right hand and arm, neck and shoulder pain, stiffness and soreness after increased housework, "empty nest syndrome," and sleeplessness. Plaintiff reported she controlled pain with

OxyContin on January 6, 2004, was "doing ok" on February 26, 2004, and was "doing ok /meds" on March 25, 2004 (R. 206, 205, 200-01,199,197, 194-95, 192, 189-90, 186-87, 185, 183, 180-81, 179). On September 8, 2005, Dr. Ortenzio found all Plaintiff's systems were normal. He noted Plaintiff was experiencing stress related to her daughter and opined Plaintiff needed to improve her insights and "decide what she wante[ed] to get on with her life and find herself" (R. 283-84). None of these diagnoses, opinions, or treatments by Dr. Ortenzio or statements about pain and limitations to him by Plaintiff supports Dr. Romano's February 27, 2006, opinions that Plaintiff has "severe fibromyalgia" and that Plaintiff should not attempt to work (R. 292).

Additionally, Dr. Romano's February 27, 2006, opinion that Plaintiff should not attempt to work was not supported by the findings of two state-agency physicians or Dr. Nolan, the physician to whom Dr. Romano referred Plaintiff for hormone testing. Dr. Franyutti found, on April 21, 2004, that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and work at the light level (R. 152-57). On July 28, 2004, Dr. Lauderman made the same findings as did Dr. Franyutti on April 21, 2004 (R. 211-16). On March 13, 2005, Dr. Nolan reported to Dr. Romano that his examination of Plaintiff on that date was unremarkable (R. 276-77).

The visit notes made by Dr. Romano relative to his treatment of Plaintiff and Plaintiff's condition and progress did not support his February 27, 2006, medical report. Plaintiff reported her pain was "under fairly good control" and she was sleeping better on November 17, 2004 (R. 246); she had "super 'burst of energy,'" she kept "going & going," she slept well, and her pain level was "fine" on December 16, 2004 (R. 240); she had been "able to do more" and her "ADL's [were] easier

26

during her cruise on January 12, 2005 (R. 239); her medications "help[ed] ADL's" and the "shots" had "helped a lot last time" on January 26, 2005 (R. 237, 238); her medication "help[ed] . . . ADL's" on April 25, 2005 (R. 232); she had pain, but the medication relieved it, the shots helped, and her headaches were much better on May 25, 2005 (R. 228-29).

On December 14, 2004, Dr. Romano instructed Plaintiff to perform shoulder range of motions exercises to treat her reduced range of motion (R. 241, 242). Plaintiff had reduced ranges of motion in her shoulder and cervical spine on January 26, 2005, but no spasm. Dr. Romano told her not to "overdo" activities (R. 237, 238). On May 25, 2005, Dr. Romano's finding was that Plaintiff had reduced ranges of motion in her cervical spine and shoulder (R. 228-29). On July 22, 2005, in response to Plaintiff stating her left hip was worse because she had been "packing and unpacking," Dr. Romano instructed her to not "overdo" her activities (R. 227). On August 22, 2005, Dr. Romano opined Plaintiff had reduced ranges of motion in her cervical spine and shoulder (R. 225). Throughout his treatment of Plaintiff, Dr. Romano prescribed Lorcet, OxyContin, Klonopin, and DHEA to treat Plaintiff's symptoms (R. 248, 246, 241, 242, 239, 237, 238, 235, 230-31, 235, 228-29, 226, 224). On August 22, 2005, Dr. Romano prescribed Genotropin (R. 224).

These office notes do not support the Dr. Romano's February 27, 2006, opinion as to Plaintiff's limitations. Plaintiff reported improvements in her ADL's, and, even though Plaintiff experienced pain, it was eased or relieved by medications. He encouraged her to exercise to increase her ranges of motion. At no time during his treatment history with Plaintiff did Dr. Romano instruct her to "not to attempt to work"; at the most, he advised her to not "overdo" her activities.

The undersigned, therefore, finds substantial evidence supports the Appeals Council's determination that the new evidence, in the form of Dr. Romano's February 27, 2006, medical report,

would not have changed the ALJ's decision, and that substantial evidence supports the ALJ's decision.

The May 11, 2006, letter by Dr. Ortenzio is a brief, comprehensive statement of Plaintiff's condition and his treatment thereof. He wrote Plaintiff "suffered from major depression and psycho-physiologic myofascial pain syndrome – fibromyalgia" for the past eight to nine years; no satisfactory treatment of either condition had been found, even though Plaintiff had undergone "extensive tradition [sic] and alternative medicine, physical treatments, sleep improvement formulas and very sophisticated hormonal adjustments." Plaintiff had been treated by "numerous psychotherapists, psychologists and psychiatrists." Plaintiff could not perform "even at short stints at even sedentary work" due to her "depressive ruminationations [sic] and poor concentration skills." Plaintiff was permanently and totally disabled (R. 311).

First, the undersigned finds the information contained in Dr. Ortenzio's letter is not new in that it is duplicative and cumulative, and it is not material in that it would not change the outcome of the Commissioner's decision. Second, there is no evidence in the record that Plaintiff had been treated by "numerous psychotherapists, psychologists and psychiatrists" as asserted by Dr. Ortenzio in the letter. Third, Dr. Ortenzio's opinion that Plaintiff was unable to function due to her depressive ruminations and poor concentration skills is not supported by the evidence of record.

Dr. Bailes evaluated Plaintiff on June 2, 2003, and opined she had intact recent and remote memories, had normal attention span and concentration, and had intact cranial nerves (R. 151). On April 23, 2004, Dr. Capage found Plaintiff had depression, a non-severe impairment, and that she had no restrictions of activities of daily living; no difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace (R. 160, 163, 170).

Additionally, Plaintiff's statements do not support the May 11, 2006, opinion of Dr. Ortenzio. On February 27, 2004, she reported she was "doing ok"; on June 21, 2004, Plaintiff reported she had "empty nest syndrome issue[s]"; on November 1, 2004, Plaintiff stated she felt "sad and anxious"; and at the administrative hearing, Plaintiff testified she had difficulty concentrating due to her not feeling well and tiredness (R. 174, 182, 261, 330).

Finally, Dr. Ortenzio's own office notes do not support his opinion that Plaintiff could not function due to her depressive ruminations and poor concentration skills. His psychiatric examination of Plaintiff was normal on December 8, 2003 (R. 190). Dr. Ortenzio opined Plaintiff's mood was stable and her psychiatric system was normal on February 3, 2004 (R. 184-85). He again found Plaintiff's psychiatric examinations were normal on February 26, March 25, and April 22, 2004 (R. 179, 181, 183). On March 15, 2005, Dr. Ortenzio opined Plaintiff's psychological system was normal (R. 288). On September 8, 2005, Dr. Ortenzio found Plaintiff's psychological system to be normal and he advised her she needed to improve her insights and "decide that she want[ed] to get on with her life and find herself" (R. 284).

Additionally, for the reasons stated above in the undersigned's analysis of Dr. Romano's opinion relative to Plaintiff's inability to work, Dr. Ortenzio's May 11, 2006, opinion that Plaintiff is permanently and totally disabled is an opinion reserved to the Commissioner. See 20 C.F.R. 404.1527(e).

For the above reasons, the undersigned finds substantial evidence supports the Appeals Council's determination that Dr. Ortenzio's May 11, 2006, letter would not have changed the ALJ's decision; the undersigned further finds substantial evidence supports the ALJ's decision.

### D. Credibility Analysis

Plaintiff next argued that the ALJ erred when she did not follow the proper two-step analysis in determining the credibility of the Plaintiff's subjective complaints regarding pain and that the ALJ erred when she determined that the Plaintiff's subjective complaints of pain were not entirely credible. Defendant asserted substantial evidence of record supported the credibility finding and the resulting RFC assessment was commensurate with Plaintiff's past relevant work experience and other work in the national economy and that the ALJ's pain analysis was adequately articulated and amenable to judicial review.

The Fourth Circuit, in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996), developed a two-step process for determination of whether a person is disabled by pain or other symptoms. The first step follows:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

*Craig*, Id. at 594.

As stated above, the ALJ must first determine whether the medical evidence shows an impairment that could reasonably be expected to cause the pain alleged. Id. at 594. The ALJ in the instant case, made the following finding: "The medical evidence establishes that the claimant has herniated cervical discs and fibromyalgia; impairments which impose limitations upon the claimant

and must be considered severe; and I resolve the second evaluation step in favor of the claimant" (R.

17). Plaintiff asserted this finding does not satisfy the first step of the pain analysis required by

*Craig*, Id. In her brief, she writes, "ALJ Cannon's analysis is one step that is a hybrid of the two

steps that are required" and "[n]owhere in the portion of the opinion that discusses [Plaintiff's]

credibility does the ALJ discuss the objective medical conditions which could be reasonably

expected to cause the pain alleged" [Plaintiff's brief at pp. 11 and 12]. Defendant argues that "[t]he

ALJ did not specifically state that Plaintiff had an impairment that could cause her symptoms, but

the ALJ evaluated the intensity, duration, and severity of the symptoms from the impairment. Thus,

the ALJ inherently found that Plaintiff had a condition likely to produce pain symptoms because the

ALJ proceeded to evaluate the severity of the symptoms" [Defendant's brief at p. 15]. In *Craig*, the

ALJ similarly identified severe impairments at step two of the sequential evaluation, yet the Court

found that his pain analysis was inadequate. Id. at 589. The Court found that the ALJ failed to

"expressly consider the threshold question of whether Craig had demonstrated by objective medical

evidence an impairment capable of causing the degree and type of pain she alleges." Id. at 596. The

Court held that the ALJ must determine whether the objective evidence could reasonably be expected

to produce "the actual pain, in the amount and degree, alleged by the claimant." Id. at 594. In the

instant case, the ALJ made no such finding.

The undersigned notes there is a serious split within the Fourth Circuit regarding this issue.

The Southern District of West Virginia has held that an ALJ "must expressly consider the threshold

question" of whether the claimant has an impairment that could cause symptoms resulting in pain.

*Hill v. Commissioner*, 49 F. Supp. 2d 865 (S.D.W.Va. 1999). That Court rejected the

Commissioner's arguments that: (1) "the ALJ did in fact 'explicitly' perform a part 1 pain analysis

31

by acknowledging that Claimant's impairments could and did in fact cause headaches and dizziness;" and (2) "the ALJ 'implicitly' performed a part 1 pain analysis by evaluating the actual functional limitations caused by Claimant's impairments." Id. at 868-869. Other district courts within the Fourth Circuit, however, have held that the ALJ did not err in failing to meet the first step of the two-step pain analysis under Craig, supra, if the ALJ (1) implicitly performed a part one pain analysis or (2) otherwise thoroughly evaluated both the objective evidence and the subjective complaints. See, e.g., Pittman v. Massanari, 141 F. Supp. 2d 601 (N.D.N.C. 2001), which reads:

> The record contains evidence of Plaintiff's post-tibial fracture bony defect – a condition which could reasonably be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ evaluated the "intensity and persistence of his pain, and the extent to which it affects his ability to work," and essentially found Plaintiff's subjective description of his limitations not credible.

(Emphasis added). See also Perkins v. Apfel, 101 F.Supp.2d 365, 373 (D. Md. 2000), and Ketcher v. Apfel, 68 F.Supp.2d 629, 650-52 (D. Md. 1999). In Ketcher, the Court found:

> Although the ALJ did not specifically state that the claimant's alleged pain could result from these medically determined impairments, it is clear that the ALJ made this determination since he noted that the impairments were "severe" and affected his functional capacity. Even if the ALJ failed to make an express finding at step one of the pain analysis, the ALJ correctly applied step two of the analysis.

Id. at 651 (internal citations omitted).

The undersigned disagrees with Defendant's argument in the instant case that, because the ALJ evaluated the intensity, duration, and severity of Plaintiff's symptoms caused from her impairments, she "inherently found that Plaintiff had a condition likely to produce pain symptoms because the ALJ proceeded to evaluate the severity of the symptoms" [Defendant's brief at p. 15]. The undersigned has consistently found that the Fourth Circuit, in Craig, supra, imposes on the ALJ

32

the duty to expressly state whether the objective evidence shows an impairment that could cause the pain claimed by claimant at step one of the pain analysis. Indeed, the *Craig* Court held that "the ALJ's consideration of the medical evidence was more than adequate." Id. at 591. The Court further found that the ALJ had reviewed all of the medical records "in painstaking detail." Id. at 592. Regardless of the ALJ's competent examination of the evidence, however, the Court found his decision inadequate because he failed to address the threshold question in the pain analysis. The ALJ's statement in the instant case is insufficient according to this standard. The undersigned, therefore, finds the ALJ erred in failing to properly establish a threshold, at step-one of the pain analysis, that Plaintiff's medically determinable impairments could cause the pain alleged.[3]

Plaintiff next alleged the ALJ erred in the second step of the credibility analysis because the ALJ discredited Plaintiff's symptoms solely because their severity was not supported by objective evidence and her determination of Plaintiff's pain was made despite the fact that the ratings Plaintiff assigned to her pain during the administrative hearing were consistent with her prior ratings. Specifically, Plaintiff asserted she rated her pain as "8 on a scale of 10" in February, 2002; as a "10 on a scale of 10" in December, 2002; and as a "8-9 out of ten at its worst" in April, 2004 [Plaintiff's brief at p. 14].

The second-step of the pain analysis, as mandated in *Craig*, is as follows:

2) It is only after a claimant has met her threshold obligation of showing by objective

---

[3]

The failure of this ALJ to "expressly consider the threshold question of whether [Davis] had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges" is the singular reason for this case having to be remanded. This ministerial failure occurs much too frequently in cases where the ALJ is called upon to review questionable claims of disabling pain. However, the undersigned cannot ignore the clear edict of the Court of Appeals in *Craig*.

medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig*, <u>supra</u> at 594.

Even though the ALJ's first-step analysis is fatally flawed, a review of the ALJ's decision finds her analysis at step two is not. She did not rely "solely" on the objective medical evidence of record in conducting the pain analysis of Plaintiff; she complied with the mandates contained in step two of the *Craig* credibility analysis in that she thoroughly considered Plaintiff's activities of daily living and Plaintiff's statements relative to her pain, Plaintiff's medical history, the results of laboratory findings, and medical treatment used to alleviate Plaintiff's pain in addition to the objective medical evidence of record.

Relative to Plaintiff's credibility, the ALJ wrote the following:

The claimant's perception that she is disabled is inconsistent with "disability" as the term "disability" is defined in the Social Security Act. The medical evidence of record is inconsistent with the Social Security definition of "disability." The claimant's rather extensive activities are inconsistent with "disability." The claimant seemed partially credible and to a significant extent straightforward, however, "6 to 7" level pain on a good day and "10" level on a bad day seems like an overstatement with level 10 pain is customarily considered "unbearable, get me to the emergency room now" pain. . . . . Why a hearing aide would not help the claimant's hearing is medically unexplained. . . . The claimant complains of right shoulder pain, however a right shoulder x-ray and right shoulder MRI have been normal . . . . Although the claimant's cervical spine MRI showed multiple abnormalities, the claimant's cervical cord appeared normal. I cannot find the claimant's testimony to be fully credible,

and I have treated it accordingly (R. 18-19).

In her decision, the ALJ assessed Plaintiff's own statements regarding her pain in conjunction with the all the available evidence.

As noted above, the ALJ discussed Plaintiff's ratings of her pain, which Plaintiff argued have been consistent with her complaints on three other occasions [Plaintiff's brief at p. 14]. The record of evidence, however, revealed that Plaintiff reported her pain differently at different times. On April 14, 2003, Plaintiff reported her conditions had improved eighty percent since March 25, 2003 (R. 142); on June 2, 2003, Plaintiff reported her pain was "not as bad" because the epidural shots and medications alleviated her symptoms (R. 150); on November 10, 2003, Plaintiff stated her pain was seven at the most and four at a minimum and the injections she received at the pain clinic had "helped" R. 191); on January 6, 2004, Plaintiff reported her pain was controlled by OxyContin and Lorcet (R. 187); on February 3, 2004, Plaintiff reported a pain level of six on a scale of one-to-ten (R. 185); on February 26, 2004, Plaintiff reported OxyContin "help[ed]" relieve the pain in her neck and shoulder (R. 183); on March 25, 2004, Plaintiff reported a pain level of four on a scale of one-to-ten and that she was "doing ok w/meds" (R. 180); on April 22, 2004, Plaintiff reported good days with pain at a five level on a scale of one-to-ten (R. 178); on November 17, 2004, Plaintiff reported she was sleeping well and her pain was "under fairly good control" (R. 246); on December 16, 2004, Plaintiff reported she had "super 'burst(s) of energy," kept "going & going" slept well, and had a "fine" pain level (R. 240); on January 12, 2005, Plaintiff reported her ADL's were "easier" during her cruise (R. 239); on January 26, 2005, Plaintiff reported her medications "help[ed]" her ADL's and the injections "helped a lot" (R. 237); on February 28, 2005, Plaintiff reported the medications "help[ed] ADL's" (R. 235); on March 29, 2005, Plaintiff reported she experienced stiffness in her

neck and right shoulder, but that medication helped relieve her symptoms (R. 233-34); and on April 25 and May 25, 2005, Plaintiff reported pain, but that the medication "help[ed] . . . ADL's" (R. 228-29, 230-31, 235). These statements are not consistent with the three statements to which Plaintiff referred in her argument.

Additionally, the ALJ found, within the body of her decision, Plaintiff's activities of daily living, as "extensive" and "inconsistent"with disability. The ALJ noted Plaintiff cared for her personal needs, could prepare meals, cared for her child, did laundry, dusted, paid bills, washed dishes, ran errands, managed banking matters, shopped, read, watched television, visited friends and relatives, drove up to forty to fifty miles per week, and took a cruise to relax in the sun (R. 17-18). These activities of daily living by Plaintiff are not consistent with the statements by Plaintiff as to her pain level.

As already noted in the above analysis, the ALJ did not discredit "the severity of [Plaintiff's] symptoms [relative to Plaintiff's credibility] . . . solely because the severity is not supported by objective medical evidence"; she relied on inconsistencies in Plaintiff's statements. The ALJ also evaluated, then relied on, not only objective medical evidence of record, but "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings in assessing Plaintiff's credibility.

The ALJ did not rely exclusively on "two selective tests" to discredit Plaintiff's complaints of pain in her right shoulder and arm, as asserted by Plaintiff, who argued that there was "other objective evidence which may explain the pain" [Plaintiff's brief at p. 14]. The ALJ did consider the December 26, 2002, right shoulder x-ray and January 15, 2003, right shoulder MRI, both of which were normal (R. 19, 130, 210). There were no other laboratory tests contained in the record

of evidence that were exclusively of Plaintiff's right shoulder. Nonetheless, the ALJ considered the December, 2002, thoracic spine study, which showed minimal degenerative changes, and the January 15, 2003, cervical spine MRI, in which the cervical cord appeared intact (R. 17). The only other test contained in the record of evidence was the February 27, 2002, cervical spine x-ray, which was a "somewhat limited study" that showed "mild degenerative change" (R. 134); it was not evaluated by the ALJ. None of these findings is consistent with Plaintiff's pain rating.

Other objective medical evidence of record, which was evaluated and considered by the ALJ, did not support Plaintiff's statements of pain. The ALJ noted Dr. Romano's November, 2004, examination of Plaintiff was unremarkable (R. 17). The ALJ considered the evaluations and opinions of the state-agency medical consultants, who opined Plaintiff could perform light work (R. 19). The record contained evidence by Dr. Ortenzio that Plaintiff's systems were normal on November 10, 2003; neurologic, musculoskeletal, and psychiatric examinations were normal on December 8, 2003, and February 3, 2004; and musculoskeletal and psychiatric examinations were normal on February 26 and April 22, 2004. Dr. Romano opined his examination of Plaintiff showed reduced ranges of motion of shoulder and cervical spine, but no spasms, on January 26, 2005; Dr. Nolan's physical examination was unremarkable on March 13, 2005; and reduced ranges of motion in shoulder and cervical spine were found by Dr. Romano on May 25, 2005 (R. 179, 183, 185, 190, 192, 228-29, 237, 238, 276). Dr. Ortenzio opined Plaintiff had reduced range of motion of her neck and multiple trigger points on September 8, 2005 (R. 283). None of these examination results supports Plaintiff's statements of pain.

The ALJ considered Plaintiff's medical history. She evaluated Plaintiff's hearing loss; her having been admitted to a hospital in February, 2003, for cervical spine pain; and Plaintiff's medical

reports showing she did not experience loss of strength, sensation, reflex, ambulation, or fine/gross upper extremity movement (R. 17). She made specific findings as to Plaintiff's claims of depression, her ability to complete ADL's, and the lack of limitations caused by it depression (R. 17-18). The ALJ considered and evaluated the medical treatment used to alleviate Plaintiff's pain. She noted Plaintiff chose to continue with conservative treatment of her spinal stenosis and C5-C6 and C6-C7 distributions (R. 17).

"Because []he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The undersigned finds substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and other functional limitations at step two of the pain analysis.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED** and the Plaintiff's Motion for Summary Judgment be **GRANTED**, **in part**, by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a **remand** of the cause to the Commissioner for the *limited and sole purpose of conducting the step one pain analysis as required in Craig, to wit: making a determination whether Davis had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges* in accord with this Report and Recommendation/Opinion, and that this action be **RETIRED** from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *28* day of *January*, 2008.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE